This action was brought to recover demurrage amounting to $8,939.37 which it was alleged had accrued upon a number of carload shipments of cotton consigned to, or deliverable to, the defendant warehouse company upon their private tracks in Greensboro, North Carolina, during the month of April, 1918.
The plaintiffs and defendant, through their counsel of record, agreed that the following facts may be "considered as proven":
"1. That the statement set forth in the first five paragraphs of the complaint are true, and that James C. Davis has been duly appointed as director general, and substituted in the place of John Barton Payne, who was director general at the time of the commencement of this action.
"2. That throughout the month of April, 1918, there was in full force and effect a certain freight tariff on the Southern Railway Company *Page 677 
and participating carriers, on demurrage and storage rules, which had been issued 7 February, 1918, and which became effective 15 March, 1918, which said freight tariff had been promulgated and published by the Southern Railway Company and participating carriers, under the authority and with the consent and approval of the Interstate Commerce Commission, said freight tariff bearing the title `Demurrage and Storage Tariff, No. 2,' and being identified by the symbols `I. C. C., A-8050,' and being applicable at stations and sidings of Southern Railway Company and roads named on page two thereof, including the city of Greensboro and the private siding of defendant hereinafter mentioned. That said freight tariff promulgated and published as aforesaid, under the authority of said Interstate Commerce Commission, is hereto attached and made a part hereof.
"3. That prior to the month of April, 1918, the defendant had under contract with said Southern Railway Company established and throughout said month maintained a private siding constructed and used solely for the purpose of connecting its storage warehouse in said city of Greensboro with the tracks of said Southern Railway Company. That all of the cotton referred to in paragraph 6 of the complaint was consigned to said private siding, and that an agreement had been made and was then existing between defendant and plaintiff that cotton consigned to defendant was to be placed by plaintiff and unloaded by defendant upon said private siding.
"4. That the agent of the plaintiff did not deliver a written notice to the consignee of the carrier's inability on account of the condition of said private siding or track to make actual placement thereupon; and that actual placement was made on the respective dates set out in column G, on pages 2 to 9 inclusive, of the itemized statements referred to in paragraph 6 of the complaint. (The admission that the agents of the plaintiff did not deliver a written notice to the consignee of the carrier's inability on account of the condition of said private siding or track to make actual placement thereupon, is not to preclude the plaintiff from showing, if he can show and if in law the court is of the opinion that it is competent to show, that such written notice was by the conduct of the defendant, or its duly authorized agents, waived.)
"5. That if, under the provisions of the said tariff and the law bearing thereon, the plaintiff is entitled to recover demurrage, and to recover both upon interstate and intrastate shipments, then the amount set forth in the complaint, to wit, $8,939.37, is the amount due the plaintiff on account of said demurrage.
"6. That if, under the provisions of the said tariff and the law bearing thereon, the plaintiff is only entitled to recover demurrage on *Page 678 
interstate shipments, then the amount of demurrage in intrastate shipments should be deducted from said amount of $8,939.37."
It was alleged in the pleadings and proven on the trial that all of the cotton, both intrastate as well as interstate shipments, was handled, shipped and delivered by the U.S. Railroad Administration during the month of April, 1918; and as the demurrage and storage rules set out in the tariff I. C. C., No. A-8050, upon the face thereof, were "applicable on interstate and intrastate traffic," the court, upon the agreed facts and the law bearing thereon, found correctly, that if the defendant was liable for demurrage during this period, the same liability would accrue under the facts and rules set forth in the tariff as to intrastate shipments and interstate shipments.
The defendant contended that it was not liable for any demurrage because of a failure on the part of the plaintiffs to comply with the provisions of the tariff, in that written notice of constructive placement had not been given as required by the tariff; and the plaintiffs contended that there had been a substantial compliance with this provision of the tariff by the written notices given the traffic manager of the defendant, as set out in the evidence, and that the notice of constructive placement, if required before demurrage could be collected, as contended for, was waived by its manager, and that when demurrage accrued and the defendant knew of its accrual, and thereafter unloaded and accepted the cotton, it was liable in law for said demurrage.
The jury brought in a verdict awarding the plaintiffs just half of the amount sued for, to wit, $4,469.68. The plaintiffs thereafter tendered judgment for the full amount as set out in the case on appeal which the court declined to sign, and the plaintiffs appealed. The court signed judgment for the amount found by the jury, and the defendants appealed.
Upon the facts agreed, the Southern Railway Company was duly incorporated, and prior to the time when the United States took possession and control of all the railroads for war purposes, it was engaged as a common carrier in the transportation of freight and passengers, and the United States Government took possession and was operating this and all other railroads by the Director General, his agents and employees in April, 1918, when this demurrage accrued.
The Director General was duly and legally appointed under the act of Congress, and the defendants were duly incorporated under the laws of this State, and were engaged in shipping and storing cotton, and the *Page 679 
plaintiff and defendant entered into the "average" agreement set out in the record. This is a condensed statement of the facts alleged in the first five paragraphs of the complaint and which are admitted to be true and proven.
As to the other facts set out in the case agreed, the only questions to be determined are as follows:
First, whether the demurrage and storage rules of the tariff in law, as in fact, applied both to intrastate as well as to interstate shipments.
Second, was the written notice of constructive placement substantially good as required by the tariff.
Third, if not, could such written notice in law be waived by the defendant company, and if so, was the same actually waived?
Fourth, whether the defendants, after receiving the written notices acknowledged to have been sent to them and received by their traffic manager, and after knowledge that demurrage had been incurred, could receive, unload and accept the cotton without being liable at law for the payment of said demurrage.
As to the first of these questions, the printed tariff, which has been made a part of the facts "considered as proven," states that it is applicable on interstate and intrastate traffic, and paragraph 2 of the facts "considered as proven" states that this tariff is applicable at stations and sidings on the Southern Railway Company and roads named on page 2 thereof, including the city of Greensboro and the private siding of the defendant hereinafter mentioned. This being so, it is not necessary to discuss whether the tariff applied to interstate shipments at law or fact, or whether the true and correct amount under the facts as proven was $8,939.37, especially in view of the further statement in paragraphs 5 and 6 of said facts "agreed to be taken as proven." It is therefore clear that if the plaintiffs are entitled to recover at all they are entitled to the sum under the agreement of facts to recover $8,939.37.
As to the second question, whether the written notice was substantially given as required by the tariff, T. B. Page, a witness for the plaintiffs, testified as follows: "I handled and conducted the business as to freight matter with the defendant, with Mr. Garland Clary, who held the position of traffic manager with the defendant, which position he had in 1918, held for several years. There was an agreement between Mr. Clary and myself that on the receipt of waybills at my office covering all the cotton shipped to them, or any cars for their warehouses, we were to call him up over the telephone at the office of the defendant and give him the car numbers and initials, the number of bales, and the marks on the cotton, and where from, if it was shown, or if he asked for it, and any other information that he asked for and we could give; but that was the principal information. It was to be *Page 680 
given each morning, over the phone, to Mr. Clary, and not to anybody else. This notice over the phone, in regard to all shipments of cotton coming into Greensboro to defendant in April, 1918, was given over the phone to him. He had a form, which I think he got up himself, upon which he entered all that information, in duplicate. He sent them down with the bill of lading, and I signed this form. These shipments were `Order, notify shipments.' When he got all this information he knew which bill of lading to take up at the bank. Upon surrender of the bills of lading and the signing of the receipt, I issued an order that went to the yard master's office for the placement of those cars containing that cotton."
Mr. Clary, traffic manager of the defendant, testified as follows: "I was traffic manager and secretary-treasurer of defendant. Before I had made this connection I had been employed by the Southern Railway Company, and was familiar with the tariff in regard to shipments. One of my duties, when I was employed by the railway company, was to get possession of and follow tariffs in regard to shipments, and I was employed by defendant because of my peculiar knowledge in regard to tariffs. In the tariffs that have been promulgated by the railway company there had been for years the same provision with regard to constructive notice that was in force and operation in April, 1918. I was demurrage clerk at one time, and knew that under certain provisions demurrage accrued on cars that were detained by shippers. As soon as waybills were received by him in the morning, Mr. Page would call me up over the telephone and give me the number of the car, the time of its arrival, the contents of the car, where it was from, and the marks of the cotton, etc. It was not exactly an arrangement; he did that with practically all cars; it was only for the benefit of the railroad company, to expedite the business. I did not have what you might call an arrangement with him by which he was to do that, but he did it just the same, and I got that information every morning. If we did not already have the bills of lading, we went and got them, upon receipt of that information, and made out a receipt for the bill of lading for Mr. Page to sign. These receipts contained all the information that I had at that time. I filled the receipt out and took it, with the bill of lading, to Mr. Page to sign. After getting the information over the telephone, and after the railroad cashier had signed receipt containing information which I had put on it, I also got a postal card notice of arrival, containing marks of the cotton, the number of bales and the car numbers, and in some instances origin of the cotton, also the initials of the cars. I kept a book containing the arrival of the cotton, date of notification of arrival, and date it was placed and unloaded, by which I checked the railroads' statement, when they presented it." *Page 681 
The U.S. Circuit Court of this, the Fourth Circuit, in a decision filed 21 December, 1922, in Davis, Director General, v. Timmonsville Oil Company, a similar case to the one at bar, after citing Rule 5, section (a), of the demurrage rules as to constructive placement, says:
"As we have heretofore pointed out, the railroad immediately upon arrival of the cars respectively mailed to the oil company notice of arrival. This notice, in substance, contained the name of the railroad to which the car belonged, the number of the car, the point of shipment, the name of consignor and the date of arrival. But it is insisted that because this notice did not also contain the information that the railroad was unable to make physical delivery of the car at the mill siding, it is a noncompliance with Rule 5, and that there was, therefore, no constructive delivery of the car."
"Formerly, no notice at all of the arrival of cars at destination was required to be given, and the giving of notice was the courtesy or custom with no binding obligation on the railroad." Coal Co. v. R. R., 245 Fed., 917.
The quoted rule has corrected this omission and imposes this obligation on the carrier, and in such case as this, the consignee might well be heard to insist that it was not chargeable with demurrage, if there had been a failure upon the part of the carrier to give it notice of the arrival of the cars; but when such notice was given as was here conceded to have been the case, and when, as is also conceded, the inclusion of the additional fact of inability to make delivery would have made no difference with the defendant, or put it in any better position than it was, or given it any information which it had not already at hand, the omission, we think, is inconsequential. To hold otherwise would be to create a defense against lawful charges, without the showing of any injury to sustain it."
Third. "If not, could such written notice be waived, and was it waived by the defendant?" By reference to the testimony of Page and Clary, as above set out, while there may be some conflict in the testimony of the two witnesses as to whether there was a specific instruction not to send written notice of constructive placement, there is no conflict as to whether the traffic manager had received all the information necessary to apprise him that demurrage was accruing, because he had full knowledge of the provisions of the traffic and had worked under similar provisions for years. This is fully settled in the case just cited and also in Interstate Commerce Commission, Opinion No. 11,085, decided 13 June, 1922; Pass Co. v.R. R., 32 I. C. C., 479; Grain Co. v. R. R., 43 I. C. C., 147; Steinhardt Kelly v. R. R. Co., 52 I. C. C., 307; Steel Co. v. R. R., I. C. C. opinion No. 9,668, decided 15 April, 1918.
On the fourth question, whether the defendant, after receiving written *Page 682 
notice sent and after knowledge that demurrage had accrued, could receive, unload and accept cotton without paying demurrage, it is distinctly held that it could not in Davis v. Timmonsville Oil Co., above cited, in which it is said: "Demurrage charges are part and parcel of the transportation charges, and are covered by the same rules of law. They are a part of the tariff and must be collected from the shipper or the consignee of the freight, to the same extent as the charge for carriers. A penalty is imposed on the carrier for failure to collect. (Union Pacific Co. v.Goodrich, 149 U.S. 690.) The purpose of the law being, of course, to secure absolute equality between the shippers. The fact that the shipments in this case were unauthorized, and the further fact that the oil company did everything in its power to prevent such shipments, would not, in our opinion, have justified its declining to pay the demurrage charges, if he accepted and unloaded the cars. It had presented to it the alternative of declining to accept the cars, in which event the railroad would have had a remedy by sale, or having accepted them, to deduct the demurrage at the time of the remittance to consignors. The fact that the carrier failed to make pressing demand for such payment did not justify the assumption that the demurrage charges had been waived, for this the carrier could not legally do, nor does it, or can it, create an estoppel which would permit by indirection that which may not lawfully be done directly. Mistake, inadvertence, honest agreement or good faith are alike, under such circumstances, unavailing. The railroad and the shipper are both required to abide the published rate." See, also, R. R. v. York, 215 Mass. 36.
On the above citations as the law of the case, and the uncontradicted facts as testified by the witnesses for the plaintiffs and defendant, the plaintiffs were entitled to the instructions asked for and set out in the defendant's first three assignments of error, and also to the judgment for the full amount which they tendered for signature.
As to the defendant's appeal, it is unnecessary to take up and discuss the errors therein assigned, for, upon the facts admitted as proven and the uncontradicted testimony as above stated, the plaintiffs are entitled to recover for the full amount of $8,939.37, and judgment should have been rendered therefor.
The case was improvidently submitted to the jury for, upon the facts as agreed to, the plaintiff was entitled to the judgment, and it should be entered here.
A case exactly in point is Corporation Commission v. R. R., 137 N.C. 1, where it was held that when the material issues are found, judgment should be entered thereon, disregarding the finding upon immaterial and irrelevant issues, and the Supreme Court in such case may, *Page 683 
in reversing or affirming the judgment below, enter a final judgment here or direct it to be so entered below. This case was affirmed on writ of error, 206 U.S. 1. In the present case, there being no further controversy as to the facts or the law to be settled, judgment will accordingly be entered here in favor of the plaintiff and against the defendant for the sum of $8,939.37, the amount agreed upon by the parties.
The power of the court to enter final judgment here was exercised in R.R. Connection Case, 137 N.C. 21, citing Code, sec. 957 (since Rev., 1542; C. S., 1412); Alspaugh v. Winstead, 79 N.C. 526; Griffin v. Light Co.,111 N.C. 438; and it was there said that "final judgment has been entered here not infrequently by order and without opinion, as a matter of course," and among other cases cited there in which this has been done was Bernhardtv. Brown, 118 N.C. 710 (36 L.R.A., 412); Caldwell v. Wilson, 121 N.C. 473, and White v. Auditor, 126 N.C. 584. The same course has been pursued in many other cases since. Among them are Industrial Siding Case,140 N.C. 244; Smith v. Moore, 150 N.C. 159; Griffin v. R. R., ib., 315;Battle v. Rocky Mount (Walker, J.) 156 N.C. 339; Chavis v. Brown (Hoke,J.), 174 N.C. 123.
Judgment will be entered accordingly in this Court in favor of the plaintiff for $8,939.37.
Modified and affirmed.